**Charles E. ROCHE, Jr., Petitioner,**

v.

**Ron ANDERSON, Superintendent, Indiana State Prison, Respondent.**

No. 3:98 CV 347 AS.

United States District Court, N.D. Indiana, South Bend Division.

Feb. 6, 2001.

Alan Freedman, Chicago, IL, Marie F. Donnelly, Charlottesville, VA, for petitioner.

Geoffrey Slaughter, Indianapolis, IN, for respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

Petitioner, Charles E. Roche, Jr.[1], was convicted of murder in a state court trial conducted in Lake County, Indiana, and was sentenced to death by the judge conducting that trial after the jury failed to make a recommendation either for or against the death penalty. The amended petition was filed by counsel in this Court on April 28, 2000 and oral argument was heard in South Bend, Indiana on October 24, 2000. This Court greatly appreciates the high degree of professional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA) 28 U.S.C. § 2244(b). Immediate reference is made to the two decisions in this case by the Supreme Court of Indiana, namely *Roche v. State,* 596 N.E.2d 896 (1992), and *Roche v. State,* 690 N.E.2d 1115 (1997). This petitioner is now confined on death row at the Indiana State Prison in Michigan City, Indiana in this district.

## I. Factual and Procedural Background

In early 1990, Edward Niksich told his live-in girlfriend, Patricia Andrasco, that Ernest "Pee Wee" Graves had stolen $120 in food stamps from Andrasco's car when Niksich gave him a ride home. T.R. 1604–05.[2] In the early evening of May 10, 1990, Niksich and Roche went to the Spot Bar in Calumet City, Illinois. T.R. 1694. Graves was there with a friend named Danny Brown, and Niksich pointed out Graves to Roche as the individual who had stolen the food stamps. *Id.* Niksich and Roche then set up a phony drug deal with Graves, and Graves and Brown returned to the Roche house with Niksich and Roche. T.R. 1812.

Once at the Roche home, Roche and Niksich took Graves and Brown to Roche's basement and Roche went upstairs to get a gun. T.R. 1812. Roche told his girlfriend, Delores Duszynski, to stay in the bedroom because he was going to shoot some guys in the basement who had stolen money from Niksich. T.R. 1031. Roche then returned to the basement, and Delores heard approximately 9–10 gunshots, followed by a brief pause, then a couple more gunshots. T.R. 1033–34. After the gunshots, Roche, Niksich, and Roche's father, Charles Roche, Sr., returned to the bedroom. Roche told Delores that all the men had on them was $19.00 and a dime bag of cocaine. T.R. 1035. Roche cut the cocaine, and Roche, Niksich and Delores each did a line of cocaine. T.R. 1036–67.

Roche, Niksich, and Roche, Sr. then loaded Graves' and Brown's bodies into the trunk of Delores' car and left the house. T.R. 1038–39. Jose Sanchez saw Roche, Niksich, and Roche, Sr. driving that evening, and Roche stopped to offer Sanchez a ride home. T.R. 950–951. Once at Sanchez's home, everyone got out of the car, and Roche opened the trunk and showed the two bodies in the trunk to Sanchez. T.R. 953, 955. The group then went inside Sanchez's house. T.R. 956. While there, Niksich told Sanchez that he had shot one of the victims in the head in the basement of Roche's home. T.R. 959. Niksich also

---

**1.** This court will hereafter refer to the petitioner as Roche, and will refer to his codefendant father as Roche, Sr.

**2.** This court will refer to the trial record as T.R. ____, the post-conviction record as P.C.R. ____, and the supplemental record as S.R. __.

told Sanchez that he had told one of the victims that he was going to die because he was with the wrong man at the wrong place at the wrong time. T.R. 960. Roche told Sanchez that he had shot one victim once in the chest and once in the head. T.R. 964.

Roche, Niksich, and Roche, Sr. then left Sanchez and drove to an access road off of Cline Avenue in Hammond, where they dumped the bodies after removing the wallets from them. T.R. 2231–32. The three then returned to Roche's home. T.R. 1133–34. Later that night, a neighbor saw a bonfire behind Niksich's home, next door to Roche, and three shadows around the bonfire. T.R. 1135. On his return home, Niksich told Andrasco that he had gotten even with "Pee Wee" (Graves) for stealing the food stamps. T.R. 1601.

Security guard Randall Bowman saw two bodies lying in the roadway at the intersection of 9th Avenue and the Cline Avenue service road in the early morning hours of May 11, 1990. T.R. 867. Bowman then returned to his office and called the police. T.R. 867–868. Lake County Sheriff's Department evidence technician Ronald Lach arrived at the scene at approximately 12:30 a.m. on May 11, 1990. T.R. 877. Lach photographed the bodies, gathered a cigarette at the scene, and noted the absence of any identification on the bodies. T.R. 896. He then went with the bodies to the Guy and Allen Funeral Home where the autopsies were conducted. T.R. 898.

Doctor Kim, a pathologist for the Lake County Coroner's Office, performed the autopsies on Graves and Brown. T.R. 1417–18. Dr. Kim found six gunshot wounds on Brown, on the left side of the chest, on the left side of the head, and four on the right side of the face. T.R. 1421, 1423, 1424–25, and 1427. Dr. Kim determined that Brown had died as a result of extensive fracturing of his skull and laceration of the brain due to gunshot wounds. T.R. 1428. Additionally, Dr. Kim also found that perforations of Brown's stomach and small intestines and internal hemorrhaging had contributed to Brown's death. T.R. 1428. Dr. Kim observed seven gunshot wounds on the body of Ernest Graves: on the right upper chest, the right side of the chest, the left side of the back, the left side of the head, the right side of the face, behind the ear, and the left side of the face. 27 T.R. 1433–40. Dr. Kim determined that Graves died as a result of gunshot wounds which caused a perforal injury of his right lung and a perforation of his brain. T.R. 1445. Dr. Kim recovered nine bullets from the bodies of Brown and Graves during the autopsies, three from Brown and five from Graves. T.R. 1415–45.

A day or two after the crime, an article about the crime appeared in the newspaper. T.R. 1044. Roche clipped the article and showed it to Duszynski, claiming responsibility for the crime to her. *Id.* On May 13 1990, Mother's Day, several neighbors were gathered in Roche's backyard. T.R. 1198. Roche told the others that he had committed a crime and showed them the newspaper clipping. T.R. 1199. Additionally, Roche sold the .38 derringer to his neighbor, James Superits, that day. T.R. 1195.

On May 13, 1990, Jose Sanchez went to the Hammond police and informed them of his knowledge regarding the deaths of Brown and Graves, pointing the finger at Roche, Niksich, and Roche, Sr. T.R. 981. Niksich and Roche, Sr. were arrested the next evening at their homes, along with Duszynski, Andrasco, and Larry Milligan, who rented the back half of Roche's home. T.R. 1080, 1608. Roche was not at home at the time, but later turned himself in to Russ Ewing, a reporter for the ABC affiliate in Chicago. T.R. 2247. Ewing took him to the Gary Police Department, where Roche made a statement saying he was the only person to have shot the victims. T.R. 2252.

While incarcerated at the Lake County Jail, Roche made two different incrimina-

ting statements. In a note exchanged with another prisoner (which the other prisoner later stated was dictated by Roche), Roche answered questions about the homicide and took responsibility for the crime, although he stated he wished he had killed Niksich that evening, as it appeared at the time that Niksich might be cooperating with the prosecution. T.R. Ex.25. Later, Roche informed a jailer that he had a handcuff key. T.R. 1689. When he was interrogated by the jail staff regarding his acquisition of the handcuff key, he volunteered information about the homicide, again stating that he was solely responsible for the crime (and thus, obviating any guilt of his father's) and effectively bragging about the crime. T.R. 69, 1708.

An information was filed against Roche on May 16, 1990 before the Honorable Judge James L. Clement[3] of the Lake Superior Court. T.R. 201. On May 21, 1990, Noah Holcomb was appointed as counsel for Roche. T.R. 195. Both Niksich and Roche, Sr., by counsel, moved for severance. T.R. 34. Roche, Sr.'s motion was granted, and the prosecutor did not seek the death penalty against Roche, Sr. P.C.R. 2462. Niksich's motion was consistently denied, although he renewed it on several occasions. T.R. 32, 67, P.C.R. 2632. Roche's counsel did not attend any of the severance hearings. P.C.R. 2467, 2501, 2565. Additionally, Niksich moved to suppress the fruits of the search of his home, and that motion was granted; Holcomb did not attend that hearing either. P.C.R. 2565. Nor did Holcomb attend several depositions of prosecution witnesses. Although Judge Clement recommended that co-counsel be obtained, Holcomb did not find co-counsel to assist him in representing Roche. P.C.R. 2496–97.

The trial against Roche and Niksich began on October 29, 1990. T.R. 353. After the presentation of the state's evidence, as detailed above, Roche took the stand in his own defense. T.R. 2198–2367. Roche testified that on May 10, 1990, Niksich had asked him to obtain a quantity of cocaine. T.R. 2202. Roche called Sanchez to arrange the delivery, and Sanchez told Roche he would deliver the cocaine by 10:30 p.m. T.R. 2204–05. Roche then told Niksich to have his buyers at Roche's home by 11:00 p.m. T.R. 2206. Roche and his father, Roche, Sr., then went to a local bar, returning to the Roche home between 10:00 and 10:30 p.m. T.R. 2206–09. Roche then sat in his kitchen waiting for Niksich's buyers to show up. T.R. 2210. Niksich and Roche, Sr. left to purchase some beer. T.R. 2211. While they were gone, Roche testified that he heard noises in the basement, and when no one answered his call, he retrieved his .38 derringer and .25 automatic handgun and went to the basement to investigate. T.R. 2212–14.

Once in the basement, Roche testified that he found two men standing in the utility room. T.R. 2214. One of the individuals pointed a gun at Roche and told Roche to give him the dope. *Id.* The second individual then told the gunman to shoot Roche. T.R. 2215. Roche told the pair he would get the cocaine, turned, pulled his own gun, and fired upon the gunman, shooting him in the chest. T.R. 2216. Roche then turned and shot the companion in the face. *Id.* The gunman raised his gun at Roche again, and Roche started shooting at the gunman with the .25 automatic. T.R. 2217.

Shortly thereafter, Niksich, Roche, Sr., and Sanchez entered the basement. T.R.

**3.** This court takes judicial notice that Judge Clement is an extremely experienced criminal trial judge, having been affirmed by the Indiana Supreme Court and Indiana Court of Appeals in a number of cases, including *Greider v. State,* 270 Ind. 281, 385 N.E.2d 424 (1979), *Spence v. State,* 272 Ind. 515, 400 N.E.2d 109 (1980), *Taylor v. State,* 273 Ind. 558, 406 N.E.2d 247 (1980), *Scott v. State,* 409 N.E.2d 1184 (1980), *Ballentine v. State,* 480 N.E.2d 957 (1985), *Dennie v. State,* 524 N.E.2d 273 (1988), *modified,* 546 N.E.2d 1226 (1989), *Woods v. State,* 575 N.E.2d 1075 (1991), and *Roark v. State,* 644 N.E.2d 565 (1994) (affirmed on conviction, reversed and remanded on death sentence) prior to his assumption of senior status on that court.

2219. The three agreed to assist Roche in disposing of the bodies; he did not want to call the police as he was a convicted felon and knew he should not have possession of guns. T.R. 2220–21. Roche went up to lock the kitchen door and heard more shots while he was upstairs. T.R. 2223. When he returned to the basement, he noticed a .22 caliber rifle in the basement, which he did not recall taking there. T.R. 2224. The group then loaded the bodies into Duszynski's car and dumped them on a service road adjacent to Cline Avenue. T.R. 2226–29.

The jury found Roche and Niksich guilty on all counts, and the penalty phase hearing for both defendants was held on November 8–9, 1990. T.R. 159–59, 292–95, 198. During the penalty phase, Roche's mother testified that she gave Roche to his paternal grandparents in exchange for their paying for her divorce from Roche's father, Roche, Sr., who was then incarcerated. T.R. 2699.

On November 9, 1990, after eight hours of deliberation, the court brought the jury into the room to inquire about dinner. T.R. 2786. The jury responded that it had reached a recommendation as to one defendant, but not the other. *Id.* The trial court then asked the attorneys if they wanted to discharge the jury and the attorneys agreed. T.R. 2790–91. The trial court then asked the jury the result of its deliberations, and the jury reported its recommendation against the death penalty for Niksich and its failure to reach a recommendation on Roche. T.R. 2792. The trial court then dismissed the jury. T.R. 2794–95. On November 30, 1990, Judge Clement ordered Roche to be executed and sentenced Niksich to the presumptive sentence of 80 years. T.R. 183, 324.

Roche appealed his conviction and sentence directly to the Indiana Supreme Court. Attorney Charles Stewart was appointed as lead appellate counsel for Roche, but Noah Holcomb was continued as appointed co-counsel for the appeal. T.R. 199. The Indiana Supreme Court issued its opinion on July 20, 1992, in a unanimous opinion written by Justice Givan, although a concurring opinion was written by Justice DeBruler. *Roche v. State*, 596 N.E.2d 896 (1996). Roche first argued that his sentence violated the Eighth and Fourteenth Amendments because of the disproportionality between Roche's death sentence and the 80 year sentence imposed on Niksich. 596 N.E.2d at 898. The Supreme Court ruled that the trial court and jury had been in the best position to consider the relative culpability of each defendant and the court would not reweigh that decision. *Id.* at 899.

Roche then argued that the sentence was inappropriate given certain facts about the crime and jury deliberations. *Id.* Roche suggested that the trial court should have considered Niksich's role as instigator and the jury's inability to reach a recommendation as a mitigating circumstance in determining his sentence. *Id.* However, the court held that the trial court was not required to consider either of those facts as a mitigating circumstance. *Id.* Roche then argued that the trial court failed to factually support its conclusion that the death penalty was appropriate, but the Supreme Court held that the record did support the trial court's determination. *Id.*

Roche next contended that his sentence was disproportionate to sentences imposed in other similar cases. *Id.* However, the Supreme Court held that this kind of proportionality review is not required by the United States Supreme Court. *Id.* at 900. The Court further held that the penalty was fair in light of other cases where the death penalty was sought and imposed. *Id.* Thus, this issue was denied. Roche again challenged the trial court's sentencing findings, arguing they were insufficiently specific and inadequately supported by fact. *Id.* The Supreme Court found that the findings were adequate and found no error on this issue. *Id.*

Roche next argued that reversible error occurred when a victim impact statement was introduced during sentencing under *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) and *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). *Id.* However, the Indiana Supreme Court noted that *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) overruled *Gathers* and *Booth* regarding the admissibility of victim impact statements in the sentencing phase of capital cases. *Id.* Thus, no error was created. *Id.* at 901, 109 S.Ct. 2207.

Roche next challenged the constitutionality of IND.CODE § 35–50–2–9(f), arguing that the trial court's discharge of the jury and determination of the existence of aggravating factors violated the Sixth and Fourteenth Amendments to the United States Constitution. *Id.* The Indiana Supreme Court held that under *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), "the Sixth Amendment does not require that the specific findings authorizing the imposition of the death penalty be made by a jury." 596 N.E.2d at 901. Therefore, the court found that IND.CODE § 35–50–2–9(f) was constitutional. *Id.*

Finally, Roche argued that the trial court committed reversible error when it allowed reference to Roche's criminal history during the guilt phase of the trial on two occasions. *Id.* The first violation occurred when the trial court admitted Roche's fingerprint card, which listed his prior conviction for burglary. *Id.* The second error happened when a witness referred to an exhibit as a "repeat offender" sheet. *Id.* The Indiana Supreme Court found that Roche had failed to object to the admission of the fingerprint card on the grounds of the prior offense and thus had waived that objection, and further found that any error stemming from the admission was harmless. *Id.* Roche moved for a mistrial after the reference to a "repeat offender" sheet, but the court found that the reference did not place him in grave peril, and further found that the trial court's admonishment to the jury cured any error in allowing the testimony. *Id.* at 902. Thus, the Indiana Supreme Court affirmed the trial court. *Id.*

Justice DeBruler, with Justice Krahulik concurring, wrote a concurrence on the proper treatment of the jury's failure to reach a recommendation. *Id.* Justice DeBruler felt that the jury's failure to reach a recommendation showed that at least one juror could not support the death penalty, and thus "that sentiment cannot rationally be rejected as a mitigating circumstance as falling within the catch-all." 596 N.E.2d at 902. However, when he reviewed the aggravating and mitigating circumstances, Justice DeBruler agreed that the aggravators outweighed the mitigators and thus found the death penalty appropriate.

Roche then filed a petition for postconviction relief in the Lake Superior Court on October 21, 1993. P.C.R. 28. On November 22, 1994, Magistrate Page set the hearing for October 30, 1995. P.C.R. 945. Roche filed an amended petition on September 15, 1995, and a motion to withdraw certain claims on October 11, 1995. P.C.R. 297–445, 551–52. Counsel moved for a continuance due to counsel's mother's serious illness, but the court denied that motion, as well as counsel's motion for continuance based on Roche's mental illness. P.C.R. 622–23.

At the hearing, Roche presented evidence that his counsel failed to present to the jury at trial concerning his childhood and his relationship with his father. At age 5, after his father was sent to prison, his parents divorced. T.R. 2699. Roche's aunt testified that the grandfather did not allow Roche to have further contact with his mother after the divorce. P.C.R. 2238. Roche's grandfather was described by Roche's aunt as extremely rigid and domineering and frequently violent towards children. P.C.R. 2319. When Roche, Sr. was released from prison, he and his new

wife, Pat Huber, took custody of Roche. P.C.R. 2297. Roche, Sr. frequently abused Roche, both physically and verbally. P.C.R. 2297–98. When Roche was 11 years old, he told Huber that Roche, Sr. had been going out with two girls and was taking Roche and allowing him to "feel up" the girls, and Huber then divorced Roche, Sr. P.C.R. 2298. Roche, Sr. kept custody of Roche. *Id.* Roche's paternal aunts Mary Ann Holmes and Mae Bottinger both testified that Roche, Sr. did not provide a stable home life for Roche. Roche, Sr. frequently asked his sisters for money and food. P.C.R. 2320, 2239. Holmes once found Roche, Sr. and Roche living at the Salvation Army in Chicago Heights, Illinois. P.C.R. 2320. Bottinger went to visit Roche, Sr. at a cabin in 1975 and found Roche in the home alone without food and without any knowledge of when Roche, Sr. would return. P.C.R. 2239. Roche, Sr. did not make any significant effort to assure Roche's attendance at school. P.C.R. 2321, 2240.

Not surprisingly, Roche was frequently in trouble with authorities for delinquency, trespassing, running away and joyriding. P.C.R. 2257. Roche's probation officer had a "brief psychological evaluation" performed on Roche by Dr. Gallencamp in April 1978. P.C.R. 2259. Dr. Gallencamp described Roche as "bitter and depressed" and observed that "Chuck reveals significant identity and emotional confusion which will require further attention." P.C.R. 2260. Roche, Sr. then moved his new wife's trailer to southern Illinois and left his wife and Roche in southern Illinois while he continued to work in northern Indiana. P.C.R. 2327. Occasionally Roche, Sr. would take his wife with him to northern Indiana, leaving Roche alone for a month at a time. P.C.R. 2328.

At age 16, Roche was arrested for stealing a car and put in the custody of the Illinois Department of Children and Family Services for approximately six months. P.C.R. 2340, 3368. Roche was assigned to the United Methodist Children's Home in Mt. Vernon, Illinois. P.C.R. 2340. When Roche arrived, he would often get wound up, would not sit still, would not keep quiet, and rarely listened to anyone. P.C.R. 2341. Roche was placed on an anti-anxiety medication while in the home. P.C.R. 3320–24. Roche ran away from the home, returned after two weeks, ran away again, and was discharged from the home. P.C.R. 3258. Eventually, Roche was found and placed in the custody of his mother. P.C.R. 3341.

There was also testimony about Roche's life after his release from prison in 1989, and the change that occurred in Roche after his father moved in with him in 1990. Roche's sister Lynn testified that Roche lived with her for the first several months after his release in 1989 and was working and contributing to household expenses. P.C.R. 2335. His employer from June 1989 through March 1990 was Michael Lopez of Actin, Inc., and Lopez testified that Roche was a good employee for the first several months of his employment, very conscientious and hardworking. P.C.R. 2293. Roche moved in with Delores Duszynski in August 1989, and she testified that in the early months of their relationship, Roche worked regularly, contributed to the household and provided a home for her daughters. P.C.R. 2304–06. Roche organized family dinners at Thanksgiving and Christmas in 1989. P.C.R. 2305.

Roche first saw his father after his release from prison at his grandfather's funeral in December 1989, and Roche, Sr. moved in with Roche in March 1990. P.C.R. 2306. Roche began drinking heavily, quit his job, and was frequently gone from the home with his father. P.C.R. 2307. Roche's sisters also noticed that Roche was drinking heavily and stopped spending as much time with them after their father re-entered his life. P.C.R. 2243, 2337. Dr. Fleming, a clinical psychologist who interviewed both Roche and Roche, Sr. prior to the post-conviction hearing, testified that Roche had a need to be accepted, admired, and approved of by

his father, which had an impact on Roche's behavior at the time of the crime. P.C.R. 1326–27. The state presented evidence by Dr. Douglas Caruana and Dr. Kathleen Pueschel that Roche most likely did not suffer from Bipolar Disorder, and even if he did, such was not evident prior to 1990 that Roche's counsel was not ineffective for failing to raise the issue during Roche's penalty phase and sentencing. P.C.R. 1709–1928.

Roche also presented testimony at the hearing regarding his shackling during the trial. P.C.R.1930–1981. Bailiff Walter Murray testified that Roche wore leg shackles during the trial, and he did not remember there being a drape over defense counsel table that would hide the defendant's legs from the jury. P.C.R. 1929–30. Murray further testified that Roche was considered an escape risk and that "with the judge's permission we left the leg irons on during trial because we thought he was an escape risk." P.C.R. 1932. Paula Niksich, mother of Edward Niksich, testified that she could see Roche's shackles during the trial and penalty phases and that she did not see a drape on defense counsel table. P.C.R. 1941–42. Patricia Andrasco Niksich testified that she could see Roche's shackles when she testified during the guilt phase of the trial and that no drape obscured the view. P.C.R.1959–60. The state presented an affidavit from Joseph Curosh, the prosecutor at trial, who stated that Roche was in leg irons throughout the trial. P.C.R. 3459. However, Curosh stated that a drape was placed on defense counsel table to prevent the jury from seeing Roche's legs during the trial. P.C.R. 3460. The post-conviction court then denied the petition on February 28, 1996. P.C.R. 876–920.

Roche's counsel filed an appeal with the Indiana Supreme Court, and shortly thereafter, Roche began personally writing the Indiana Supreme Court in an effort to waive his appeals. *Roche v. State,* 690 N.E.2d 1115, 1119 (Ind.1997). The Indiana Supreme Court remanded the case to the Lake Superior Court to determine Roche's competency, and that court found Roche competent to waive his appeals. *Id.* However, at the same time, Roche attempted to waive his appeals in a conviction in LaPorte Superior Court arising from an unsuccessful prison escape attempt, and the LaPorte Superior Court did not find Roche competent to waive his appeal. *Id.* Thus, the Indiana Supreme Court, in its unanimous opinion of December 30, 1997, written by Justice Sullivan, chose to address the merits of Roche's appeal. *Id.*

Roche first asserted that he had received ineffective assistance of trial counsel, and to the extent the court found those claims waived for failure to raise them on direct appeal, he raised a claim of ineffective assistance of appellate counsel. *Id.* at 1120. Roche specifically argued that his trial counsel failed to obtain a severance from Niksich, failed to secure co-counsel, failed to attend certain pre-trial hearings, allowed Roche to be tried while wearing ankle restraints, failed to object to jury instructions on robbery and self-defense, failed to make an opening statement in the guilt phase, permitted Roche to testify on the issue of self-defense, failed to investigate Roche's use of alcohol prior to the crime, failed to establish mitigating evidence regarding Roche's childhood, his father's influence at the time of the crime, his relative culpability and his mental health, failed to object to certain penalty phase instructions, agreed to let the trial court dismiss the jury without having reached a recommendation on Roche's sentence, and rendered deficient performance during the judicial sentencing. *Id.* The Indiana Supreme Court noted that the post-conviction court had found the claims of ineffective assistance of trial counsel waived because they were not raised on appeal, but it chose to address those claims anyway because Roche's trial counsel was co-counsel on the appeal. *Id.* at 1121.

On the claim of ineffective assistance of trial counsel for failing to obtain a severance of Roche's trial from that of Niksich, the court found that Roche had failed to show that a motion for severance would have been granted, and in fact, Niksich's several motions for severance were denied. *Id.* at 1122. Thus, the failure to obtain a severance was not ineffective assistance of counsel. *Id.* Similarly, Roche's counsel's failure to obtain co-counsel was not ineffective because such was not required under Indiana law at the time of the trial and because Roche presented no authority to support such a requirement. *Id.* Roche then argued that his trial counsel's failure to attend several pre-trial hearings, specifically the Roche, Sr. and Niksich severance hearings and Niksich's motion to suppress hearing, was ineffective. *Id.* The Indiana Supreme Court found that this argument was not presented to the post-conviction court in any manner and thus was not available for review. *Id.* at 1123.

Roche then argued that his counsel was ineffective for allowing the use of ankle restraints on Roche during the trial. *Id.* The Indiana Supreme Court noted that there was conflicting evidence during the post-conviction proceedings regarding the use of a drape around defense counsel's table to hide the restraints, but there was no testimony or evidence that any juror saw the restraints. *Id.* Further, the only reference in the trial record to the restraints was a mention prior to Roche's taking the stand about having Roche be seated in the witness chair before the jury's return so they wouldn't see the restraints. *Id.* Although the court conceded Roche's point that a record should have been made concerning the restraints at the trial, and the post-conviction court should have made findings regarding the weight of the testimony given on the restraint and drape issue, the court held that no basis existed for finding counsel ineffective on this issue because no evidence was presented that a juror was aware of the restraint and no specific claim of prejudice was made. *Id.*

Roche next alleged that his trial counsel was ineffective for failing to object to jury instructions on robbery and self defense. *Id.* at 1124. The court found that both instructions accurately reflected the law and thus counsel was not ineffective for failing to object. *Id.* Similarly, the court found that Roche's counsel was not ineffective for failing to make an opening statement during the guilt phase, as that is a matter of trial strategy. *Id.* Likewise, the decision to allow Roche to testify was a matter of trial strategy and thus not grounds for an ineffective assistance of counsel claim. *Id.* at 1125. Roche's argument that his counsel was ineffective for failing to investigate Roche's use of alcohol before the crime was also denied as the court found that intoxication would not have been available as a defense because the facts of the case showed that Roche had developed a plan and moved the bodies after the crime. *Id.*

Roche next contended that his trial was ineffective for failing to adequately present mitigating evidence during the penalty phase of the trial. *Id.* Roche argued that trial counsel did not adequately present evidence of Roche's abusive childhood, but the Supreme Court found it added only detail and not weight to the mitigation argued at trial. *Id.* at 1126. Roche suggested that his trial counsel was ineffective for not pursuing an argument that Roche, Sr.'s re-emergence in Roche's life was a significant factor in the crime, but the court held that this decision was a trial tactic, and would not have had a significant effect on the jury. *Id.* Roche argued that his trial counsel was deficient for failing to argue the relative culpability of Niksich and Roche, Sr. during the penalty phase, but the court held that Roche's counsel had argued such during the judicial sentencing, and the court had held on direct appeal that the relative culpability of Roche's co-defendants was not relevant to Roche's sentence. *Id.* Finally, Roche asserted that his counsel was ineffective for

not having a mental health evaluation performed on Roche for purposes of determining mitigating circumstances. *Id.* At the post-conviction hearing, one doctor suggested that Roche suffered from Bipolar Disorder and was having a manic episode at the time of the offense. *Id.* Two other doctors from the Department of Corrections had diagnosed Roche with Bipolar Disorder after his incarceration on the offense, but the two doctors offered by the state at the hearing both testified that they did not find Roche to be suffering from a mental disease or defect at the time of the offense. *Id.* The Indiana Supreme Court considered the evidence presented on Roche's mental health and found that it did not rise to the level of a mitigating circumstance, such that Roche's counsel was ineffective for failing to raise Roche's mental health as a mitigating circumstance. *Id.* at 1127.

Roche asserted ineffective assistance by trial counsel with respect to several instructions during the penalty phase of the trial. *Id.* Roche first argued that the trial court should have instructed the jury that mitigating circumstances do not need to be proven beyond a reasonable doubt. *Id.* The Indiana Supreme Court had previously ruled in *Miller v. State,* 623 N.E.2d 403 (Ind.1993) that because reasonable doubt instructions place the burden on the state, "there is no inference that a defendant's evidence comes under this scrutiny," and thus found no error in this case. 690 N.E.2d at 1128. Roche then contended that the court failed to instruct the jury that the state bore the burden to prove the aggravating circumstances outweighed the mitigating circumstances and failed to instruct the jury that if the aggravating and mitigating circumstances were of equal weight, they must recommend against the death penalty. *Id.* The Indiana Supreme Court held that no instruction on burden of proof was required on the balancing of aggravating and mitigating circumstances and that the instructions were consistent with Indiana law requiring that the aggravating circumstances outweigh the mitigat-

ing ones. *Id.* Thus, the instructions were appropriate and counsel was not ineffective. *Id.* Roche further argued that the trial court did not meaningfully instruct the jury on what mitigating circumstances must be considered because it did not define the word "mitigate." *Id.* The court held that the instruction listing the statutory mitigating circumstances adequately instructed the jury on mitigating circumstances and denied the claim. *Id.*

Roche next claimed that the instructions did not require the jury to consider other reasons not to impose the death penalty. *Id.* However, the court found that the catch-all provision of the mitigating circumstances statute was adequate, and the court's instruction that the jury was not required to impose the death penalty even if the aggravating circumstances outweighed the mitigating circumstances was sufficient to allow the jury to consider any reason they found appropriate to avoid imposing the death penalty. *Id.* at 1128–29. Roche argued that the jury may have been misled into believing that mitigating circumstances must be proven beyond a reasonable doubt, but the court rejected this claim in *Harrison v. State,* 644 N.E.2d 1243, 1259 (1995) and did not choose to reconsider it in this case. *Id.* at 1129. Roche claimed that instructing the jury to consider all evidence from the guilt phase effectively allowed it to consider non-statutory aggravating factors, but as the instruction conformed to IND.CODE § 35–50–2–9(d) (Supp.1990), the court found that instruction appropriate. *Id.* Finally, Roche argued that the jury should have been instructed to begin its deliberations in the penalty phase with the presumption that no aggravating circumstances had been proven. *Id.* In *Bellmore v. State,* 602 N.E.2d 111, 126–27 (1992), the Supreme Court held that the trial court was not required to tell the jury that the defendant was presumed innocent of aggravating circumstances, and the court found *Bellmore* controlling on this argument. *Id.*

Roche claimed that his trial counsel had been ineffective when he failed to object to the court's dismissal of the jury prior to reaching a recommendation on Roche. *Id.* The court held that the length of a jury's deliberations is within the discretion of the trial court. Although Roche's counsel had expressed reservations about the release of the jury, when the trial court indicated it would not inquire into the results of the jury's deliberations before making a decision on discharge, Roche's counsel did agree to the dismissal of the jury after consulting with Roche. *Id.* at 1129–30. Thus, the Indiana Supreme Court found that Roche's counsel was not ineffective on this issue. *Id.* at 1130.

In his final argument regarding ineffective assistance of counsel, Roche claims that his trial counsel rendered ineffective assistance at the sentencing hearing. *Id.* Roche specifically claimed that his counsel made no more argument than did counsel in *Averhart v. State*, 614 N.E.2d 924 (1993), in which the court had granted post-conviction relief based on the deficient performance of trial counsel during the penalty phase and at sentencing. *Id.* However, in Roche's case, counsel did question the family witnesses, rather than allowing them to testify "free-form" as they had in *Averhart*, and counsel had made an argument before the jury sufficient to prevent them from recommending death. *Id.* Thus, the court found Roche's counsel not to be ineffective at that phase of the trial. *Id.*

Roche next complains that Magistrate Page allowed several errors during the post-conviction proceedings which prejudiced his ability to present his claims. *Id.* Roche first argues that the magistrate did not allow the presentation of certain evidence. *Id.* at 1131. The magistrate instructed the parties to present the testimony of their witnesses by affidavit, then granted the state's hearsay objection when Roche presented affidavits of his witnesses, rather than live testimony. *Id.* The Supreme Court characterized this as a misunderstanding or miscommunication between the magistrate and Roche's counsel. *Id.* However, because Roche did not identify a rule of procedure violated by the magistrate's rulings or contend that the rulings caused him prejudice, the court did not find this to be prejudicial error. *Id.* Roche also complained that the magistrate precluded his counsel from independently contacting the jurors. *Id.* The magistrate did require Roche's counsel to have any letter for jurors pre-approved by the court, but Roche did not object to this process and did interview at least two jurors. *Id.* Thus, the court found no error on this issue. *Id.*

Roche complained that the magistrate erred in denying several discovery motions. *Id.* Roche sought the prosecution's entire file from the original case, which the state refused to provide, and the post-conviction court refused to compel. *Id.* at 1132. The Indiana Supreme Court held that Roche was primarily seeking to discover the files to investigate possible claims, rather than to vindicate actual claims, and thus the post-conviction court acted appropriately in denying Roche's motion to compel. *Id.* at 1133. Roche also filed interrogatories seeking information regarding state's expert Dr. Caruana, which the state refused to answer, and the post-conviction court refused to compel. *Id.* at 1134. The court held that because the information was sought only in preparation for Caruana's deposition, which Roche was still able to conduct, the denial of his motion compel answers to interrogatories did not preclude him from preparing for the deposition and was not an abuse of discretion. *Id.* Similarly, the post-conviction court refused to compel a response to an interrogatory asking why the state had not sought the death penalty against Roche, Sr. *Id.* The Indiana Supreme Court held that as Roche sought no authority for his right to this information, the court would not impose a duty on prosecutors to explain their decisions to seek, or not seek, the death penalty. *Id.* Additionally, the

court had already denied Roche's proportionality argument on direct appeal, and thus the information could not support a claim that would overcome *res judicata*. *Id.*

Roche appealed the post-conviction court's exclusion of several exhibits, including his records from the Department of Corrections, the United Methodist Children's Home, and the Illinois Department of Children and Family Services, the transcript from his father's trial and the transcript from his co-defendant's attempted murder trial. *Id.* The court found that Roche had made no showing as to why the exclusion was an abuse of discretion, and the exhibits were transmitted with the record on appeal in any event, so no error occurred. *Id.* Finally, Roche complained that the magistrate had exceeded his authority in handling the post-conviction proceedings, but the court held, as it had in *Matheney v. State*, 688 N.E.2d 883, 894–96 (1997), that the magistrate had acted pursuant to statute in conducting the proceedings gathering the facts, but that Judge Conroy had issued the final order, and thus the post-conviction court's judgment was constitutional. *Id.* at 1134–35. Thus, the court affirmed the denial of Roche's petition for post-conviction relief. *Id.* at 1135.

## II. Standard of Review

A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

> A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the fo-

rums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential standard for evaluating state court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Supreme Court handed down an opinion further explaining the application of the AEDPA on April 18, 2000, in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[4] *Williams* specifically addresses the application of the "contrary to, or involved an unreasonable application of, clearly established law" language from the AEDPA in the *Strickland* context. 120 S.Ct. at 1499. In a divided opinion, Justice O'Connor delivered the opinion of the court regarding the appropriate interpretation of that clause. *Id.* at 1516. Specifically, the court held that "contrary to" and "involved an unreasonable application of" clauses of the statute have independent meaning. *Id.* at 1519. The court defined "contrary to" as an instance where the state court "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20. The court held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unrea-

sonable." *Id.* at 1521. Concluding the section of her opinion defining the statute, Justice O'Connor stated as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied-the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1523.

■ It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as defined by Justice Scalia in *Castille v. Peoples*, 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke*, 148 F.3d 705 (7th Cir.1998), the Seventh Circuit explained that:

A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits. . . . [Because] the state courts did not address

4. The United States Supreme Court also issued an opinion in *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) on April 18, 2000. While that opinion also addresses the AEDPA, it primarily concerns the need for an evidentiary hearing in

the federal district court. As such has not been requested here, this order will not discuss that case. It will, however, differentiate the two *Williams* cases by using the first names of the petitioners therein.

Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full and fair opportunity to review his claims." *Id.*, citing *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary*, 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

### III. Shackling Claims

Roche first argues that his shackling during the guilt and penalty phases of the trial violated his right of due process and his right to a fair trial and fair sentencing in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution, requiring reversal of his conviction and sentence. There is no real question that Roche was in fact required to wear leg irons during the trial. The question for

this court is what effect that fact has under established United States Supreme Court precedent. In *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Supreme Court first addressed the issue of shackling. The defendant in *Allen* attempted to conduct his own defense, but when the judge tried to limit his questions in voir dire to the prospective juror's fitness, the defendant argued with the judge in an "abusive and disrespectful manner." 397 U.S. at 339, 90 S.Ct. 1057, quoting *United States ex rel. Allen v. Illinois*, 413 F.2d 232, 233 (7th Cir.1969). When the judge asked the defendant's stand-by counsel to proceed with the voir dire, the defendant verbally threatened the judge's life and tore and threw his attorney's file. *Id.* at 340, 90 S.Ct. 1057. The judge then had the defendant removed from the courtroom for the remainder of voir dire. *Id.* The defendant returned to the courtroom, where he was told he would be allowed to stay if he "behaved [himself] and [did] not interfere with the introduction of the case." *Id.* The defendant began complaining loudly when his counsel moved to separate witnesses and the judge removed the defendant from the courtroom again. *Id.* at 341, 90 S.Ct. 1057. The defendant was returned to the courtroom for identification on several occasions during the state's case, and eventually returned for his own case after promising to behave appropriately. *Id.* On habeas, the district court denied his petition, but the Seventh Circuit reversed, holding that a defendant could not be excluded from the courtroom during his trial, but must remain, even if bound and shackled. *Id.* at 342, 90 S.Ct. 1057. The Supreme Court reversed the Seventh Circuit, holding that "there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." *Id.* at 343–44, 90 S.Ct. 1057. The court then explained that "no person should be

tried while shackled and gagged except as a last resort." *Id.* at 344, 90 S.Ct. 1057.

Building on that, the Supreme Court in *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), considered the issue of "whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." Although the court did not find the use of uniformed security personnel to rise to the level of shackling, it ·did set forth again its basic holding of the use of shackling. The Indiana Supreme Court had already recognized this holding in its case *Walker v. State*, 274 Ind. 224, 410 N.E.2d 1190 (1980), when it quoted as follows: " '[t]he rule that a prisoner brought into court for a trial is entitled to appear free from all bonds or shackles is an important component of a fair and impartial trial. And shackles should never be permitted except to prevent the escape of the accused, to protect everyone in the courtroom, and to maintain order during the trial. *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).' *Woodards v. Cardwell*, 430 F.2d 978, 982, (6th Cir.1970) *cert. denied*, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971)." 410 N.E.2d at 1193–94.

There is no discussion in the trial record as to the reasons for Roche's being shackled during the guilt and penalty phases of his trial; the sole mention of the shackles occurs immediately prior to Roche's taking the stand, when his attorney asks that Roche be allowed to take the stand before the jury returned so they would not see the shackles when he walked to the stand. T.R. 2194. Nor did Roche appeal the use of shackles in his direct appeal. Roche raised the issue as ineffective assistance of counsel in his post-conviction proceedings. The post-conviction court made no findings on this issue because it ruled that all claims of ineffective assistance of trial counsel were waived unless they were.subsumed into claims of ineffective assistance of appellate counsel, and this issue was not raised in an ineffective assistance of appellate counsel claim.[5] P.C.R. 876–917. The Indiana Supreme Court held that because Roche's trial counsel was co-counsel on the appeal, Roche could raise issues of ineffective assistance of trial counsel and therefore addressed the shackling issue on the merits. 690 N.E.2d at 1121, 1123. The Indiana Supreme Court held on this issue as follows:

> Conceding Roche's point that the trial court should‚have made a record of the reasons for requiring the restraints and that we are without post-conviction court findings on the weight and credibility of the testimony given, we nevertheless find no basis for concluding that trial counsel was ineffective in this regard. First, the record indicates that trial counsel was careful about preventing the jury from seeing his client's ankle restraints. Second, the exhaustive post-conviction investigation in this case turned up no evidence that any juror was aware of the restraints. Third, Roche makes no specific claim of prejudice as a result of the restraints.

690 N.E.2d at 1123.[6]

Roche argues that he is entitled to relief under 28 U.S.C. § 2254 because the

**5.** This court notes that the practice of the Lake Superior Court to not consider claims of ineffective assistance of trial counsel unless such were raised in the direct appeal or were raised as part of an ineffective assistance of appellate counsel claim has been since negated by the Indiana Supreme Court's decision in *Woods v. State*, 701 N.E.2d 1208 (1998). Although that case was decided after Roche's appeal of his post-conviction claim, because the Indiana Supreme Court considered the merits of Roche's ineffective assistance of trial counsel claims, this court will consider those claims to have been fully adjudicated on the merits and not waived.

**6.** Additionally, Roche argued that the use of ankle restraints was fundamental error, but in a footnote, the court held that it perceived "no reason for addressing the fundamental

Indiana Supreme Court's decision was contrary to and an unreasonable application of *Allen* and *Holbrook*. The Indiana Supreme Court did not recite any case law in its decision on the shackling issue, although the *Allen* and *Holbrook* cases were cited to it in the petitioner's brief on appeal. Return to Show Cause, Tab F, p. 23. The Indiana Supreme Court held on the performance prong that Roche's counsel was not deficient in his performance because he was "careful about preventing the jury from seeing his client's ankle restraints." 690 N.E.2d at 1123. Roche argues that this statement fails to consider the evidence presented during the post-conviction proceedings which suggests that the jury could have seen Roche's restraints while he was seated at counsel table.

The court also found that the "exhaustive post-conviction investigation ... turned up no evidence that any juror was aware of the restraints." *Id.* Putting aside the limitation on petitioner's ability to interview jurors, Roche argues that under *Holbrook*, "[w]henever a courtroom arrangement is challenged as inherently prejudicial, ..., the question must not be whether the jurors actually articulated a consciousness of some prejudicial effect, but rather whether, 'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook*, 475 U.S. at 570, 106 S.Ct. 1340 (quoting *Estelle v. Williams*, 425 U.S. 501, 505, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)).

Finally, the court found that Roche had not made a specific claim of prejudice as a result of the restraints. 690 N.E.2d at 1123. At a minimum, this mischaracterizes Roche's appellate brief, which states, "the prejudice to Roche is clear: the jury recommended against the death penalty for Niksich but were unable to reach a recommendation for Roche. There is, therefore, a reasonable probability that the result of Roche's trial would have been

error claims independently of the ineffective assistance of counsel claims." 690 N.E.2d at

different but for the restraints." Return to Show Cause, Tab F, p. 25. Roche further argues that *Allen* held that being forced to appear in shackles is prejudicial *per se* because it may affect the jury's verdict.

■ Roche argues that the decision of the Indiana Supreme Court is both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. This court is forced to agree. Under *Strickland*, Roche must show both deficient performance and actual prejudice. Both are present here. Although Roche's counsel may have "careful about preventing the jury from seeing his client's ankle restraints," he was not careful in protecting his client from having to wear the restraints in the first place. The use of shackles is an extreme remedy which "should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). There is no explanation on the record for the use of shackles, other than the bailiff's recollection during post-conviction proceedings that "with the judge's permission we left the leg irons on during trial because we thought he was an escape risk." P.C.R.1932. Roche's counsel's failure to object on the record to the use of shackles is a clear example of deficient performance. As the United States Supreme Court has specifically labeled the use of shackles as prejudicial in *Holbrook*, the existence of prejudice caused by the deficient performance is also clear. The Indiana Supreme Court failed to consider the relevant United States Supreme Court law on this issue in making its decision on post-conviction, and the decision it reached is both contrary to and an unreasonable application of the appropriate precedent. Thus, this court must grant the writ on this issue.

1121, n. 6.

### IV. Severance Claim

Roche next claims that his counsel provided ineffective assistance because he failed to move for severance from the other defendants prior to trial. As noted above, the Indiana Supreme Court found that the failure to obtain a severance prior to trial did not prejudice Roche. 690 N.E.2d at 1122. In *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the United States Supreme Court held that United States District Courts should grant motions for severance when "there is a serious risk that a joint trial would compromise a specific trial right of the one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539, 113 S.Ct. 933. The Seventh Circuit explained in *United States v. Clark*, 989 F.2d 1490 (7th Cir.1993) that the defendant must show that he "could not possibly have a fair trial without severance." *Id.* at 1499. That court listed four circumstances which require severance: "1) conflicting and irreconcilable defenses; 2) a massive and complex amount of evidence that makes it almost impossible for the jury to separate evidence as to each defendant; 3) a codefendant's statement that incriminates the defendant; and 4) a gross disparity of evidence between the defendants." *Id. Zafiro* explained the first of those circumstances by holding that joinder is prejudicial "when the evidence or testimony offered by one defendant is truly irreconcilable with the innocence of a codefendant." 506 U.S. at 543, 113 S.Ct. 933.

Roche argues that the facts of the trial prove the defenses of Roche and Niksich to be so conflicting and irreconcilable that the failure to sever was highly prejudicial to Roche. He points to several pieces of evidence admissible against Niksich which would have been inadmissible if Roche had been tried alone. Specifically, Niksich's admission to his girlfriend that he got even with one of the victims for stealing her food stamps, T.R. 1601; Niksich's admission to Sanchez that he shot one of the victims in the head in Roche's basement, T.R. 959; Niksich's admission to Sanchez that he told one of the guys that they were going to die and that he told the victim he was "with the wrong man at the wrong time and the wrong place," T.R. 959–60; and Niksich's admission to Sanchez that he took the victim's wallet and money. T.R. 960. As Roche's theory was that he acted in self-defense, the admissions by Niksich all suggest a preconceived plan to kill the victims, rather than the act of self-defense which Roche testified to.

The Indiana Supreme Court held that Roche's counsel was not ineffective in failing to obtain severance from Niksich. 690 N.E.2d at 1122. Roche was unable to demonstrate that a motion for separate trials would have been granted, as Niksich's repeated motions for severance were all denied. *Id.* Thus, Roche did not show any prejudice from the failure to seek severance and did not show ineffective assistance of counsel. *Id.* The respondent here argues that this decision was not an unreasonable application of *Strickland*, and thus Roche is not entitled to relief under this claim.

This court agrees with the determination of the Indiana Supreme Court on this issue. While Roche's counsel's failure to move for severance was not well thought out, this court is convinced that no prejudice sprung from the failure to sever the trial. There is no doubt in this court's mind that Roche would have been convicted, whether tried separately or jointly with Niksich, given his numerous confessions to the police and others. This is a much less close call than *Rastafari v. Anderson*, 117 F.Supp.2d 788 (N.D.Ind.2000), in which this court also denied a petition for habeas relief based on a failure to file a motion for severance. In *Hernandez v. Cowan*, 200 F.3d 995 (7th Cir.2000), the Seventh Circuit held that prejudice exists if "there was a reasonable probability that the severance would have made a difference to the outcome of the trial." 200 F.3d at 999. This

court cannot find that severance would have made a difference to the outcome of the trial, and thus no prejudice resulted from Roche's counsel's failure to file a motion for severance prior to trial.

## V. Ineffective Assistance of Trial Counsel

■ Roche next asserts several claims that he had ineffective assistance of counsel at his trial and sentencing beyond the shackling and severance claims already addressed. These claim are considered under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In order to prevail on this claim, Roche must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

There is no question after *Williams* that *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) "qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams*, 120 S.Ct. at 1512. Additionally, it is clear that the Indiana Supreme Court has not decided these claims in a manner "contrary to . . . clearly established Federal law." Thus the sole question for this court is whether the Indiana Supreme Court's decision affirming the denial of Roche's petition for post-conviction relief "involved an unreasonable application of" *Strickland.*

### A. Trial Phase Claims

#### 1. Failure to Attend Pre-Trial Hearings

■ Roche first complains that his trial counsel failed to attend several pretrial hearings, including the suppression hearing on the Niksich search warrant, the motions to sever Roche, Sr. and Niksich, Niksich's motion to depose Roche, and Niksich's motion in limine. The Indiana Supreme Court held that this claim was not presented to the post-conviction court and thus was not available for review. 690 N.E.2d at 1122. Roche argues that the claims were presented to the post-conviction court and cites his post-hearing brief. P.C.R. 718–20. Although this court finds that the claims were not specifically raised until the post-hearing brief, and not in the final amendment to the post-conviction petition, this court does find that the claims were raised prior to the entry of an order by the post-conviction court, and thus were properly raised. Therefore, procedural default does not apply, and this court must consider this claim de novo.

■ The evidence presented during the post-conviction proceedings makes it clear that Roche's counsel did not attend those hearings. P.C.R. 2434–2676. His counsel was not questioned regarding his failure to attend, however. Each of the hearings was held on the motion of one of Roche's co-defendants, and it is not clear from the record that Roche's counsel was even aware of the hearings prior to their taking place. The hearings are not reflected on Roche's docket sheet. T.R. 195–200. While the right to counsel is fundamental under the Sixth and Fourteenth Amendments, this court has been unable to find any cases holding that a defendant has a right to counsel at all pre-trial hearings and notes that none have been cited by petitioner in his brief before this court. Thus, this court finds that while the failure of Roche's counsel to attend the hearings was less than adequate performance, that failure was not prejudicial to the ultimate

outcome, and thus not ineffective assistance of counsel.

### 2. Inadequate Preparation for Trial

Roche next argues that his counsel's failure to attend the pretrial hearings left him inadequately prepared for trial. Thus, he failed to object to inadmissible evidence, did not respond to prejudicial comments made about Roche during the hearings, and did not move for severance. Additionally, Roche's counsel did not conduct any investigation of the offense other than reviewing the video of Roche turning himself in, driving by the scene, and reviewing the discovery. P.C.R. 1506. Roche argues that this failure to prepare made his counsel ineffective during trial. Specifically, Roche's counsel did not present an opening statement, he did not present evidence about Roche, Sr.'s participation in the murders, he did not adequately cross-examine the firearms expert, and he failed to develop a cogent theory of the defense. The Indiana Supreme Court considered these issues individually and found that the claims did not rise to the level of ineffective assistance of counsel. 690 N.E.2d at 1124. Roche argues that the court failed to consider the cumulative effect of these errors in making its *Strickland* analysis.

█ While Roche accurately points out the Indiana Supreme Court's failure to consider the cumulative prejudicial effects of the alleged deficiencies in Roche's counsel's performance, he fails to note that the Supreme Court did not find any deficiencies in that performance. The cumulative effect of nothing is nothing. Because the court did not find any single deficient act, there was no possible prejudice which could accumulate. This court agrees with the Indiana Supreme Court; it does not find any of the acts listed in this section to constitute deficient performance, and thus the cumulative effect of those acts is not prejudicial, any more than any of the single acts constitutes prejudice. Thus the

court does not find ineffective assistance of counsel on this issue.

### B. Sentencing Issues

Roche argues that his counsel's investigation of penalty phase issues was deficient, and that deficient performance prejudiced him by not presenting relevant mitigating evidence to the jury and the judge. Roche's counsel testified in post-conviction that he did the following to prepare for the penalty phase of Roche's trial: he spoke with Roche, he reviewed Roche's pre-sentence report from a prior burglary conviction, and he spoke with Roche's mother and "berated" her for not supporting her son when charged with the burglary. P.C.R. 1589. Roche's counsel testified that he was concerned with Roche's "need to please his father" and was aware of Roche's "extremely dysfunctional" childhood, but he did not perceive a need to have Roche's mental health evaluated prior to trial. P.C.R. 1489, 1504, 1503. Roche's counsel did not attempt to obtain records from the Methodist Children's Home or Illinois Department of Youth and Family Services, although Roche's time in their care was listed in the prior pre-sentence report. Roche's counsel did subpoena Roche's records from the Indiana Department of Corrections, but did not recall if he had reviewed them. Those records all reflected that Roche had serious mental/emotional problems which the Methodist Children's Home could not address, and for which Roche was placed on a variety of anti-anxiety and anti-psychotic drugs during his incarceration. P.C.R. 3320–23, 2800–02, 2763, 2766.

Roche presented evidence at the post-conviction hearing to support his theory that if Roche's trial counsel had had Roche's mental health evaluated, he would have been able to show Roche suffered from Bipolar Disorder and was having a manic episode at the time of the offense. P.C.R. 1224, 1301. Roche argues that this information would have supported two

statutory mitigating factors not considered by the trial court: that Roche was under the influence of an extreme mental or emotional disturbance at the time of the crime, and that his ability to conform his behavior to the law at the time of the offense was substantially impaired. P.C.R. 1321–24. Additionally, a mental health expert could have presented evidence to the jury regarding Roche's relationship with his father and the influence that relationship had on Roche's behavior. All of this, argues Roche, constitutes deficient performance by Roche's trial counsel.

The Indiana Supreme Court considered all of these claims and did not find Roche's counsel's performance to be deficient. 690 N.E.2d at 1125. It further noted that "counsel's penalty phase performance was sufficiently effective to prevent the jury from recommending a death sentence." *Id.* It specifically held that "trial counsel more than adequately presented the jury with at least the principal contours of Roche's background, character and record and effectively presented that information to the jury and the trial court." *Id.* at 1126. It held that Roche's counsel's decision not to discuss Roche's relationship with his father was "a matter of trial strategy which cannot form the basis for establishing ineffective assistance of trial counsel unless there was no sound basis for not pursuing the strategy," and the court found there might have been sound reasons for not utilizing this approach. *Id.* With respect to the mental health issue, the court found that most of the evidence relied upon by Dr. Fleming in making her diagnosis that Roche suffered from Bipolar Disorder at the time of the offense was also evidence of his unstable childhood, which was presented by counsel in mitigation. *Id.* at 1127. The court held that Dr. Fleming's evidence was "highly probative of Roche's difficult childhood and upbringing but only marginally supportive of a possible claim that Roche suffered from any mental impairment at the time of the offenses that would rise to the level of a mitigating circumstance. As discussed *supra*, trial counsel adequately argued Roche's childhood as a mitigating circumstance. We find he had no further duty to argue mental health." *Id.*

■ Roche argues that the Indiana Supreme Court failed to consider the cumulative effect of the omitted evidence in assessing the ineffectiveness of trial counsel in violation of *Strickland* and *Williams*, and assessed the various categories of mitigating evidence in an unreasonable application of *Strickland*. He specifically challenges the Supreme Court's findings that the mitigation evidence presented during post-conviction added "only detail and not weight," *id.* at 1125, its finding that Roche's counsel had a strategic reason for failing to present evidence regarding Roche's father, *id.*, its holding on the issue of relative culpability, *id.*, and its holding on counsel's failure to present evidence of mental illness. *Id.* at 1127. On the last point, Roche claims that the Indiana Supreme Court's finding that "the only medical or psychological evidence about Roche presented to the post-conviction court or relied upon by Dr. Fleming post-dated Roche's trial," is a false statement. This court does not agree with any of Roche's assertions on this point, especially the last one. While substantial evidence was presented regarding Roche's childhood, and while that evidence supported the conclusion by Dr. Fleming that Roche had been suffering from a mental impairment at the time of trial, it does not support the conclusion that Roche's counsel was ineffective for failing to raise the mental health issue at the time of trial. Unlike the defendant in *Brewer v. Aiken*, 935 F.2d 850 (7th Cir.1991), where the defendant had an extensive record of mental impairment prior to trial, there is nothing in Roche's record prior to trial to state conclusively that Roche had a mental impairment. A qualified professional might come to that conclusion after reviewing the records, although the professionals who testified at Roche's post-conviction hearing came to differing conclusions, but the evi-

dence is not so overwhelming that this court can say, any more than could the Indiana Supreme Court, that Roche's trial counsel was ineffective for failing to raise the issue in mitigation. Similarly, this court does not find the Indiana Supreme Court's determination on these issues to be an unreasonable application of *Strickland*, and therefore, no writ will issue on this claim.

## VI. Trial Court Error

Roche's final claim of error is that the trial court erred in refusing to allow the jury to consider the fact that Roche, Sr. had not been charged with the death penalty, in failing to consider that Roche turned himself in, and in failing to consider the relative culpability of Niksich as a mitigating factor. He further alleges that the Indiana Supreme Court failed to consider this claim, and thus it is entitled to de novo review by this court. The Indiana Supreme Court considered Roche's argument regarding the relative culpability of the defendants both on direct appeal and in post-conviction, and this court finds its decision on the issue to be a reasonable application of the appropriate Supreme Court precedent. 596 N.E.2d at 900; 690 N.E.2d at 1126. The Indiana Supreme Court did not address Roche's argument on the trial court's refusal to allow the jury to know that Roche, Sr. had not been charged with the death penalty. However, there is no doubt that the trial court was itself aware that Roche, Sr. had not been charged with the death penalty, and the trial court was the ultimate decisionmaker on Roche's sentence. The trial court listed Roche's greater culpability as an aggravating factor in determining Roche's sentence. Thus, the judge considered this evidence considered mitigating by Roche in his determination and no violation of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) occurred. Thus, relief under 28 U.S.C. § 2254 is inappropriate for this claim.

## VII. Conclusion

This court has found that the claims concerning severance, ineffective assistance of counsel, and trial court errors do not justify relief under 28 U.S.C. § 2254. However, it has found that relief is appropriate under that statute for Roche's claim regarding ineffective assistance of counsel on the issue of shackling. There is no doubt in this court's mind that Roche committed the crime for which he was convicted; in fact, he admitted to the crime on several occasions. Rather than require that Roche be retried, when it is clear from his subsequent conduct that Roche is in fact an escape risk, *see* 690 N.E.2d at 1119, and would most likely be retried in shackles, albeit with an explanation on the record, this court will order Roche sentenced to life without parole.

For the reasons stated above, the petition for writ of habeas corpus is now **GRANTED** conditioned on the State of Indiana resentencing petitioner to life without parole.

**IT IS SO ORDERED.**